# In the United States Court of Federal Claims

Filed: November 17, 2023[*]
No. 23-1116
FOR PUBLICATION

---

**NOBLE SUPPLY & LOGISTICS LLC,**
                    *Plaintiff,*

**v.**

**UNITED STATES,**
                    *Defendant,*

*and*

**ASRC FEDERAL FACILITIES
LOGISTICS, LLC,**
                    *Defendant-Intervenor.*

---

*Gary J. Campbell*, Perkins Coie LLP, Washington, DC, *Seth A. Locke*, *Miles McCann*, and *Jedidiah K.R. Blake*, of counsel, for the plaintiff.

*Steven M. Mager*, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, *Andrew T. McGuire*, Defense Logistics Agency, of counsel, for the defendant.

*Damien C. Specht*, Morrison & Foerster LLP, Washington, DC, *James A. Tucker*, *Lyle F. Hedgecock*, *Roke Iko*, of counsel, for the defendant-intervenor.

**MEMORANDUM OPINION**

**HERTLING, Judge**

The plaintiff, Noble Supply & Logistics, LLC ("Noble Supply"), brings this pre-award bid protest to challenge an amendment ("Amendment 12") to a solicitation under Federal Acquisition Regulation ("FAR") Part 12 issued by the Defense Logistics Agency ("DLA") for its Maintenance Repair and Operations ("MRO") Tailored Logistics Support Prime Vendor

---

[*]Pursuant to the protective order in this case, the Court initially filed this opinion under seal on November 6, 2023, and directed the parties to propose redactions of confidential or proprietary information by November 16, 2023.  (ECF 39.)  The parties did not propose any redactions, and this opinion is being reissued for public availability as filed.

Program ("Prime Vendor program").  Another offeror, ASRC Federal Facilities Logistics, LLC ("AFFL"), moved to intervene, and its motion was granted.

The solicitation originally required offerors to pass on to the government "any rebates or discounts received by the prime vendor."  (AR 224.)  After being asked by Noble Supply whether this provision included so-called "prompt payment discounts," the DLA amended the solicitation to require offerors to include "prompt payment discounts" among the rebates and discounts that must be passed on to the government.  That amendment was challenged in a protest at the Government Accountability Office ("GAO"), and the DLA rescinded the amendment.

Procurements under FAR Part 12 must ordinarily abide by customary commercial practices, and the DLA apparently acknowledged that it was a customary commercial practice for an offeror to retain such discounts when it withdrew the amendment.  FAR Part 12 allows agencies to include terms inconsistent with customary commercial practice if the agency obtains a waiver.  To include prompt payment discounts among those which an offeror must pass on to the government under the Prime Vendor program solicitation, the DLA sought such a waiver pursuant to FAR 12.302(c).  The waiver request was approved, and the DLA then issued Amendment 12.

The plaintiff challenges Amendment 12, arguing that the waiver is arbitrary and capricious because it did not comply with the requirements of FAR 12.302(c).  For the waiver to have been proper, it had to meet three requirements, including explaining the customary commercial practice at issue.  Noble Supply argues that the waiver did not meet this requirement because the waiver fails to address adequately how prompt payment discounts differ from other types of discounts that offerors must typically pass on to the government.  This failure, the plaintiff argues, undercuts the validity of the remainder of the waiver's analysis, renders its conclusion deficient, and makes Amendment 12's issuance based on the defective waiver arbitrary and capricious.

The defendant and defendant-intervenor argue that the waiver satisfies the requirements of FAR 12.302(c).  These parties stress that contracting officers are afforded high levels of discretion.  Within the context of this solicitation, the waiver evinces an adequate understanding and explanation of prompt payment discounts.

The DLA acted reasonably and in compliance with FAR 12.302(c) in including prompt payment discounts among the discounts and rebates that offerors must pass on to the government.  The waiver provides a rational basis for the DLA's need to depart from customary commercial practices regarding prompt payment discounts for this solicitation.  The plaintiff's motion for judgment on the administrative record is denied, and the defendant's and defendant-intervenor's motions are granted.

## I.    BACKGROUND

The MRO operates a Tailored Logistics Support program that provides facilities-maintenance products and services for the United States military.  (AR 188-89.)  Noble Supply has held contracts under the existing program for "the past five years."  (AR 16.)

On April 27, 2021, the DLA issued a solicitation for the next iteration of the Prime Vendor program to serve the DLA throughout the United States through 12 regionally specific firm-fixed-price, indefinite delivery, indefinite quantity contracts.  (AR 188.)  The DLA plans to award one contract to a designated prime vendor for each of the solicitation's 12 geographic zones.  Each of these 12 contracts includes a base ordering period of two years and four two-year option periods.  (*Id.*)  The prime vendors will procure for the DLA a wide range of facilities-maintenance supplies, including construction supplies, electrical products, and janitorial supplies.[1]  (AR 189.)

The solicitation required offerors to submit separate proposals for each zone.  Each proposal had to include: (1) a statement of the offeror's qualitative merit; (2) price; (3) "Storefront Support"; and (4) administrative documents and proof of relevant certifications.  (AR 213.)  One of these administrative documents was a Price Evaluation List, which required offerors to list, among other elements, "firm fixed acquisition ceiling prices" for 300 items representative of the kinds of items the DLA would order under the Prime Vender program.  (AR 93.)  These ceiling prices set the maximum amount a supplier could charge the prime vendor for a listed item.  After acquiring the item, the DLA would reimburse the prime vendor for "the price that the prime vendor p[aid] its subcontractor or supplier for the material or service ordered."  (AR 224.)

By submitting a proposal, every offeror guaranteed that "any rebates or discounts" the offeror received would "result in corresponding discounts and reductions to the quoted acquisition price."  (AR 224.)  Thus, whenever an offeror receives a discount or rebate on goods or services purchased for the Prime Vendor program, the offeror must "immediately pass these savings to the [g]overnment in the contract price and invoice for payment."  (AR 328.)

The proposal-acceptance period for the last of the 12 solicitation zones was initially scheduled to close on August 20, 2021.  (AR 188.)  In July 2021, however, another offeror protested the solicitation before the GAO, arguing that the solicitation contained "inaccurate estimates [and] irrational weighting of distribution fees."  (AR 1481.)  The DLA took corrective action in response to this protest by analyzing new data sets based on the protester's concerns, and it promised to extend the closing dates for each zone after finishing its analysis.  (AR 1495.)

---

[1] The solicitation's scope "includes but is not limited to": HVAC supplies, plumbing supplies, electrical products, tools, chemical products, construction supplies, prefabricated structures and re-locatable buildings, perimeter-security supplies, communication devices for use by maintenance personnel, appliances, janitorial products, and incidental commercial facilities maintenance services.  (AR 189.)

GAO dismissed the protest.  (AR 1496.)  After the DLA reissued the solicitation, proposals were due for the last of the 12 zones by September 17, 2021.  (AR 1932, 2028.)  The DLA anticipated making awards by July 14, 2022.  (AR 120.)

Awards under the solicitation were delayed, and on July 28, 2022, AFFL's predecessor-in-interest alerted the DLA to what it perceived to be a "gap" in the solicitation's pricing language.[2]  AFFL explained to the DLA that, as written, the solicitation could allow an offeror procuring items for the Prime Vendor program through an affiliated supplier to pay unreasonably high acquisition prices for the items.  (AR 1497-1501.)  Such an offeror could then "propose significantly lower distribution prices in anticipation of recovering some of their distribution cost[s]" by sharing the affiliated supplier's "margin and profit from the acquisition price of products" sold to the DLA at the inflated prices.  (AR 1499.)

While the DLA considered AFFL's concern, Noble Supply contacted the DLA in October 2022 to ask whether prompt payment discounts were considered "discounts" or "rebates" that the solicitation required vendors to pass on to the government.[3] (AR 2041.)  The DLA confirmed to Noble Supply that the solicitation required awardees to pass on to the government "any and all discounts and/or rebates received from subcontractors or other sources of supply in connection with performance" of the contract.  (*Id.*)  This requirement included prompt payment discounts.  (*Id.*)  That same month, the DLA sent letters to all prime vendors with existing contracts under the Prime Vendor program to "remind [them] of the significance and necessity of compliance" with the requirement to include prompt payment discounts among those passed on to the government.  (AR 6432.)

In response to the issue raised by AFFL and Noble Supply's inquiry, the DLA amended the solicitation in January 2023 by issuing Amendment 10 to the solicitation.  (AR 2044-46.)  Amendment 10 addressed AFFL's affiliate-supplier concern and added explicit language including prompt payment discounts among the types of discounts or rebates that awardees must

---

[2] During the pendency of this solicitation, AFFL was spun off from and stepped into the shoes of the original offeror, Science Applications International Corporation ("SAIC").  It was an SAIC employee who alerted the DLA to the "gap" in the solicitation.  No one questions AFFL's standing as successor-in-interest to SAIC for this procurement, although Noble Supply unsuccessfully opposed AFFL's motion to intervene on other grounds.

[3] The parties identify the payment structure at issue using different terms.  The plaintiff prefers the term "early payment incentive," while the defendant and defendant-intervenor use the term "prompt payment discount."  The FAR uses the term "prompt payment discount."  FAR 14.408-3; *see also* FAR 32.902 ("discount for prompt payment").  A Westlaw search for "early payment incentive" produced zero results across both caselaw and secondary sources.  This opinion uses the term "prompt payment discount" because it is the term used by the FAR to describe the payment structure at issue in this protest.

pass on to the government.  (AR 2045.)  On the inclusion of prompt payment discounts, Amendment 10 read:

> The acquisition price is defined as the actual invoice price of the product and/or incidental service that the prime vendor pays its sub-contractor or supplier for the material or incidental service ordered under a contract line item, less the value of any rebates, discounts (*including prompt payment discounts*), payments, fees, and/or remittances of any kind received by the prime vendor . . . (whether received prior to or after issuance of the delivery order).

(*Id.*) (Emphasis added to reflect the new language.)[4]

Another offeror then filed a protest with the GAO challenging Amendment 10.  (AR 2109.)  That offeror argued, as the plaintiff does in this case, that the inclusion of prompt payment discounts within the category of discounts and rebates that must be passed on to the government ran contrary to customary commercial practices, and the DLA had not obtained a waiver to include such a provision in the solicitation.  (AR 2113.)  In response to the protest, the DLA took corrective action and issued Amendment 11, which rescinded Amendment 10.  The GAO dismissed the protest as academic.  (AR 2147.)

Following the rescission of Amendment 10, the contracting officer requested a waiver from the MRO division chief in accordance with FAR 12.302(c).  The waiver request sought to include in the solicitation a provision inconsistent with customary commercial practices by requiring offerors to pass on prompt payment discounts to the government.  (AR 2189-93.)  FAR 12.302(c) requires a waiver request for a solicitation issued under Part 12 of the FAR to: (1) explain the customary commercial practice at issue; (2) support the need for the solicitation to include a term that deviates from this practice; and (3) explain why the customary commercial practice is inconsistent with the government's needs.

The waiver's summary of the issue of whether prompt payment discounts were a customary commercial practice was limited.  In preparing the waiver request, the contracting officer simply noted that the DLA had learned from an offeror that the inclusion of a provision requiring prompt payment discounts to be passed on to the ultimate purchaser is inconsistent with customary commercial practice.  The waiver request otherwise includes no discussion of why prompt payment discounts are offered in the private commercial market or the possible differences between prompt payment discounts and other types of discounts and  does not explain why prompt payment discounts are treated differently in customary commercial practice.

---

[4] The amendment also addressed AFFL's affiliate-supplier concern by informing offerors that they must adjust their distribution fees in the event of a downward change due to "quantity, post-award price change, and/or rebate, discount, payment, fee or other remittance received by the prime vendor in connection with its fulfillment of the line item" at *any* time during contract performance.  (AR 2045.)

The plaintiff argues that the failure of the waiver request to address the supposed economic reason for the distinctive treatment of prompt payment discounts undercuts the validity of the remainder of the analysis and renders the waiver's conclusion arbitrary and capricious.

Following its summary of the customary commercial practice of prompt payment discounts, the waiver request addressed why the customary commercial practice was inconsistent with the government's needs and why a variation was needed.  The waiver request explained that in the Prime Vendor program, the DLA "places the prime vendor in a position of trust."  (AR 2190.)  The prime vendor works with military customers to source the materials "on a competitive basis" and to deliver those materials to the customer.  (*Id.*)  The prime vendor effectively "functions as a 'finder' and at times, a consolidator," working with suppliers of the goods and services to deliver what the DLA's customers need.  (*Id.*)  To secure the best possible price for the DLA's customers, the prime vendor must "aggressively seek rebates and discounts against the acquisition price . . . and remit those rebates and discounts" to the government to "reduce the overall cost to the [g]overnment and the taxpayer."  (*Id.*)  At oral argument, counsel for the DLA further elaborated that after the prime vendor has received proposals for a given item, it chooses a "presumptive awardee" and provides all of the proposals to the DLA for evaluation.  This discretion afforded to the prime vendor in choosing a presumptive awardee, according to the DLA, increases the need for the prime vendor to provide transparent pricing to the DLA.

To "compensate the Prime Vendor for its efforts," DLA pays a "distribution fee" that reflects "'all elements of the contract price other than the acquisition price, including the [Prime Vendor's] delivery/shipping costs . . . general and administrative expense, overhead, packaging, and <u>anticipated profit</u>.'"  (*Id.* (quoting the solicitation, AR 225) (emphasis added in the waiver request).)  Due to "the discretion afforded to the Prime Vendor" in choosing the items needed to fulfill the DLA's requirements, the contracting officer explained that prime vendors must act with a "heightened degree of transparency" in their pricing.  (*Id.*)

The waiver request further explained that the Prime Vendor program requires stringent discount rules to prevent prime vendors from "artificially increas[ing] the acquisition price of an item" or "inflating the acquisition price through . . . discretionary mark-up imposed" by an affiliate supplier, "to the detriment of the [g]overnment and the taxpayer."  (AR 2191.)  The waiver request noted that "DLA has encountered problems of this kind in the past."  (*Id.*)  Specifically, the contracting officer explained that, in 2014, a prime vendor under a similar contract had "formed an undisclosed affiliate entity, which it utilized to make profits" beyond those received through the distribution fees it received under the contract.  (*Id.*)  The DLA again confronted a similar situation in 2017, when a prime vendor "pled guilty to having inflated the delivered price of a product supplied, . . . thereby improperly inflating its profit on the transaction."  (*Id.*)  The DLA concluded that the imposition of a requirement inconsistent with customary commercial practice covering prompt payment discounts was necessary because without the obligation to pass along such discounts, the prospect that prime vendors would continue to inflate the government's costs for their own benefit would continue to be "a risk under the structure of the MRO program."  (AR 2191.)  The contracting officer asserted that a customary commercial practice that allows a vendor to retain prompt payment discounts is incompatible with the DLA's needs for "transparency, accountability, protection against

6

potential fraudulent business practices, and elimination of unnecessary costs under this contracting program." (*Id.*)

The MRO Division Chief approved the waiver request, as required by Defense Logistics Acquisition Directive ("DLAD") 12.302(c), and the DLA then issued Amendment 12, which incorporated into the solicitation the same prompt payment language previously added by Amendment 10 and removed by Amendment 11. (AR 2193.)

## II.    PROCEDURAL HISTORY

On March 13, 2023, Noble Supply protested Amendment 12 before the GAO. (AR 4434.) It filed a supplemental protest two weeks later as "further support for [its] initial protest challenging the reasonableness of the FAR 12.302(c) waiver." (AR 4589 n.1.) The GAO denied the protests, finding that the agency "properly issued a waiver . . . and the terms are reasonably justified." (AR 6514.)

On July 19, 2023, the plaintiff filed this action, alleging that the "DLA's waiver is arbitrary and capricious because it fails to meet the requirements set forth in FAR 12.302(c)." (ECF 1 at 18.) AFFL sought to intervene as of right under Rule 24(a) of the Rules of the Court of Federal Claims ("RCFC") or by permission under RCFC 24(b); the plaintiff opposed the motion to intervene. After briefing, AFFL was granted permissive intervention. (ECF 25.) All parties subsequently moved for judgment on the administrative record under RCFC 52.1. Oral argument was held on October 31, 2023.

## III.    JURISDICTION AND STANDING

The Court of Federal Claims has jurisdiction over "an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1). Actions brought under this provision are typically called bid protests.

The plaintiff claims that the DLA acted arbitrarily and capriciously when it issued Amendment 12 by adding terms that are contrary to customary commercial practices without having first received a waiver that met FAR 12.302(c)'s requirements. The Court of Federal Claims has jurisdiction over such a claim.

To have standing in a bid protest action in this court, a plaintiff must be an "interested party." 28 U.S.C. § 1491(b)(1). To qualify as an interested party, an offeror must allege facts, which if true, "establish that it (1) is an actual or prospective bidder, and (2) possesses the requisite direct economic interest." *Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307 (Fed. Cir. 2006).

Neither the defendant nor AFFL challenges Noble Supply's standing. Noble Supply is both an incumbent contractor and an actual bidder for this solicitation. As an actual bidder with a substantial chance of securing the award, Noble Supply has standing to maintain this pre-award

protest. *CACI, Inc.-Fed. v. United States*, 67 F.4th 1145, 1152 (Fed. Cir. 2023); *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1359 (Fed. Cir. 2009).

## IV.   STANDARD OF REVIEW

Review of a motion for judgment on the administrative record pursuant to RCFC  52.1 requires the court to make factual findings based on the administrative record. *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005).  Genuine issues of material fact do not preclude judgment.  *Id.*  Rather, the court holds a trial on the administrative record and must determine whether a party has met its burden of proof based solely on the evidence contained in that record.  *Id.* at 1355; *see also Palantir USG, Inc. v. United States*, 904 F.3d 980, 989 (Fed. Cir. 2018).

Bid protests are evaluated under the Administrative Procedure Act's standard of review. *See* 28 U.S.C. § 1491(b)(4) (adopting the standard of 5 U.S.C. § 706).  Under that standard, an agency's procurement action may only be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law."  5 U.S.C. § 706(2)(A).  A court may grant relief only upon the finding that either "the procurement official's decision lacked a rational basis" or "the procurement procedure involved a violation of regulation or procedure." *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1338 (Fed. Cir. 2001); *WellPoint Mil. Care Corp. v. United States*, 953 F.3rd 1373, 1377 (Fed. Cir. 2020).

A court's review of the procurement decision made by the procuring agency in a bid protest is "highly deferential."  *Advanced Data Concepts v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000).  A court will not disturb an agency's determination so long as there is a reasonable basis for it, even if the court might have reached a different conclusion as to the "proper administration and application of the procurement regulations" in the first instance. *Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed. Cir. 1989).  A court must take care not to substitute its judgment for that of the agency, even if reasonable minds could reach different conclusions.  *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 285-86 (1974). The "agency's path" in reaching its decision need only "reasonably be discerned" from the record to be upheld.  *Id.* at 286.

In reviewing an agency waiver issued under FAR 12.302(c), a court need not decide whether the challenged provision of the solicitation and waiver is inconsistent with customary commercial practices.  *ABF Freight System, Inc. v. United States*, 55 Fed. Cl. 392, 406 (2003). Rather, the court's role is to determine whether the waiver is "legally defective" in violation of the FAR.  *See id.* ("Because plaintiffs have failed to show that the agency's waiver is legally defective, the court does not find that the solicitation improperly required offerors to deviate from customary commercial practices.").  A court may also review whether "the methods adopted . . . to implement the [w]aiver" are reasonable.  *U.S. Foodservice, Inc. v. United States*, 100 Fed. Cl. 659, 681 (2011).

## V.    DISCUSSION

Under FAR Part 12, a solicitation must generally reflect customary commercial practices. FAR 12.301(a)(2) ("contracts for the acquisition of commercial products or commercial services shall, to the maximum extent practicable, include only those clauses . . . [d]etermined to be consistent with customary commercial practice"). Notwithstanding this obligation to adhere to customary commercial practices, the FAR allows for exceptions. FAR 12.302(a) provides that "because of the broad range of commercial products and commercial services acquired by the [g]overnment, variations in commercial practices, and the relative volume of the [g]overnment's acquisitions in the specific market, contracting officers may, within the limitations of this subpart . . . tailor" specific provisions of the solicitation "to adapt to the market conditions for each acquisition."

Thus, a solicitation under FAR Part 12 may include a provision inconsistent with customary commercial practices if a waiver is requested and approved. FAR 12.302(c). The waiver must: (1) "describe the customary commercial practice found in the marketplace;" (2) "support the need to include a term or condition that is inconsistent with that practice;" and (3) "include a determination that use of the customary commercial practice is inconsistent with the needs of the [g]overnment." *Id.* An individual with authority "at least one level above the contracting officer" must approve the waiver. DLAD 12.302(c).

The plaintiff argues that the waiver issued by the DLA to support Amendment 12 is arbitrary and capricious because "it fails to (1) meaningfully discuss the customary practice of [prompt payment discounts] and (2) demonstrate a need to include the [prompt payment discount] passthrough requirement introduced in Amendment 12." (ECF 30 at 20.) The adequacy of the waiver's content aside, the plaintiff also argues that the addition of prompt payment discounts to the solicitation effects a policy change to DLAD in violation of DLAD Procurement Note C08, which requires the DLA's Acquisition Director to approve such changes. (ECF 30 at 35.)

The defendant argues that the DLA met the requirements of FAR 12.302(c) by describing the use of prompt payment discounts in the commercial market, explaining why the DLA needed to deviate from the customary commercial treatment of prompt payment discounts, and determining that adherence to the customary commercial practice regarding prompt payment discounts was inconsistent with the DLA's needs. (ECF 34 at 23-24.) AFFL argues that even if the plaintiff is correct that prompt payment discounts are not technically "discounts" (ECF 33 at 13), that position is "irrelevant to the rationality of the waiver," which is adequately supported (ECF 33 at 16). The defendant also rejects the claim that Amendment 12 changed DLA policy; rather, it was specific to this procurement, and therefore did not require approval by the DLA Acquisition Director.

AFFL argues that the waiver is not arbitrary and capricious. AFFL also contends that Noble Supply has waived its ability to challenge Amendment 12 when it could have earlier filed a challenge to the terms of the solicitation. Because success on this point would foreclose the plaintiff's complaint entirely, this argument is addressed first.

### A.   Timeliness of the Plaintiff's Complaint under *Blue & Gold Fleet*

AFFL argues that Noble Supply waived its ability to object to the solicitation's discount requirement under *Blue & Gold Fleet v. United States*, 492 F.3d 1308 (Fed. Cir. 2007).  (ECF 33 at 19.)  Under *Blue & Gold Fleet*, an offeror that has the chance to object to the terms of a solicitation containing a "patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection."  *Id.* at 1313.  AFFL argues that this rule bars Noble Supply's protest because it was "plainly apparent to all offerors, since issuance of the original solicitation, that all discounts (including prompt payment discounts) must be credited to DLA."  (ECF 33 at 19.)  Therefore, if the plaintiff wanted to object to the inclusion of prompt payment discounts as among those discounts required to be passed on to the government, "it should have protested the terms of the [s]olicitation prior to proposal submission."  (*Id.* at 20.)  At oral argument, the defendant agreed with the plaintiff that Noble Supply has not waived its ability to protest the adequacy of Amendment 12, although the defendant agreed with AFFL that Noble Supply did waive an ability to protest the terms of the solicitation itself.

Noble Supply is challenging the adequacy of Amendment 12, asserting it fails to comply with FAR 12.302(c).  Amendment 12 was issued in March 2023.  Noble Supply is not challenging the inclusion of the discount provision of the original solicitation, and it promptly challenged Amendment 12 once the DLA issued it.  Noble Supply could not have challenged the amendment prior to the agency issuing it.

*Blue & Gold Fleet* does not apply.  Noble Supply's protest of the adequacy of the waiver under FAR 12.302(c) is not foreclosed.

### B.   DLA's Waiver under FAR 12.302(c)

#### 1.   The Parties' Arguments

Over the course of this protest, the parties' briefs addressed a variety of issues relating to the meaning of the term "discount" and the soundness of the DLA's business decision in requiring offerors to pass on prompt payment discounts to the government.  At oral argument, however, Noble Supply clarified that the crux of its argument is simply that the waiver's explanation of the customary commercial treatment of prompt payment discounts fails to satisfy the obligation imposed by FAR 12.302(c).

The plaintiff argues that the DLA's waiver is arbitrary and capricious because the DLA failed to consider the nature of prompt payment discounts as distinct from other types of discounts and rebates.  The plaintiff asserts that prompt payment discounts are "fundamentally different than general discounts."  (ECF 36 at 5.)  Rather than perform an original analysis, the DLA simply recited another offeror's representation that prompt payment "discounts are not customarily passed through to the ultimate customer."  (AR 2189.)  The waiver request includes no further discussion of prompt payment discounts, their use in the commercial market, and why they differ in their commercial treatment.  Unlike a "general discount," which the plaintiff argues is both "risk-free and cost-free" to a purchaser, a prompt payment discount requires a purchaser to weigh the advantage of a price reduction against "the cost of its capital, and opportunity

costs." (ECF 30 at 22-24.)  The decision to accept a prompt payment discount is based on an analysis of whether use of such a discount is financially beneficial in any specific situation, whereas a general discount, the plaintiff argues, is always beneficial for a buyer to accept.

The defendant disagrees with the plaintiff's characterization of general discounts and argues that many other types of discounts entail a cost to the customer; it is not that prompt payment discounts are in a category different from general discounts, but rather that all payment arrangements under the category of "discounts" carry their own idiosyncrasies.  For example, a discount for buying products in bulk offers consumers a per-item cost savings, but at the expense of requiring them to pay for and store more products than they need at once; as another example, customers offered a manufacturer's coupon must weigh the benefit of buying an item at a reduced price with the burden of buying that item when they do not need it and spending the money sooner than they otherwise would to get the better price.  Prompt payment discounts are not the only type of discounts that may entail a cost to the customer and require an analysis of the cost and benefit of the specific situation.

While the plaintiff's arguments may accurately describe customary commercial practices surrounding prompt payment discounts, the defendant argues that the plaintiff's conclusion that the waiver was unreasonable merely reflects "disagreement with the agency's stated rationales." (ECF 34 at 33.)  The defendant cites both dictionary definitions and federal regulations to support the DLA's decision to include prompt payment discounts within the types of discounts offerors must pass on to the government under the Prime Vendor program.  (*Id.* at 35.)

The defendant argues that prompt payment discounts "expressly fall within the broad ambit of" the plain meaning of a "discount." (*Id.* at 34-35.)  Merriam-Webster, for example, defines "discount" as "a reduction made from the gross amount or value of something: such as (a)(1) a deduction made from a regular or list price . . . [or] (a)(2) a proportionate deduction from a debt account usually made for cash or *prompt payment*." *Discount*, Merriam-Webster (2023), https://www.merriam-webster.com/dictionary/discount (emphasis added).  Treating prompt payment discounts as "discounts" generally aligns with (or, at least, is not foreclosed by) various statutes and regulations.  (ECF 34 at 35.)  The Prompt Payment Act provides rules for when an agency is "offered a discount by a business concern from an amount due . . . in exchange for payment within a specified time." 31 U.S.C. § 3904.  Under the Office of Management and Budget's "Prompt Payment" regulations, the only definition provided for the term "discount" is "an invoice payment reduction offered by the vendor for early payment." 5 C.F.R. § 1315.2(n). A discount received for prompt payment falls within the scope of this broad definition.

The issue for resolution is not whether the plaintiff or the defendant's position is correct as a matter of economics or linguistics; it is whether the DLA's treatment of the issue is reasonable.  Given the common dictionary-definition of "discount" and the treatment of prompt payment discounts in other sources of federal law, the DLA's decision to include prompt payment discounts among the discounts and rebates offerors must pass on to the government had a rational basis.

##### 2.      The Waiver's Description of Customary Commercial Practices

The crux of the plaintiff's argument is that a discount for early payment is economically distinct from other types of discounts, and the waiver fails to acknowledge that distinction.  The economics of prompt payment discounts are a key aspect of the issue, it explains, and the omission of an adequate explanation renders the waiver arbitrary and capricious.

A waiver under FAR 12.302(c) must describe the customary commercial practice found in the marketplace.  The waiver request acknowledges and accepts the contention that prompt payment discounts "are not customarily passed through to the ultimate customer."  (AR 2189.)  The waiver request explains, however, that agreements between manufacturers and distributors covering discounts and price terms are "widely understood within the context of the contracts to which they apply."  (*Id.*)

While the waiver request does not provide a detailed description of how prompt payment discounts function in the marketplace or why they would not typically be passed on to the ultimate purchaser, nothing in the FAR requires this degree of detail.  The waiver request sets forth the customary commercial practice at issue.  Under FAR 12.302(c), nothing more is required.  *See Honeywell*, 870 F.2d at 648 (quoting *M. Steinthal & Co. v. Seamans*, 455 F.2d 1289, 1301 (D.C.Cir.1971)) ("If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations.")

The plaintiff's request that the DLA be required to provide a more extensive and analytical description of prompt payment discounts and how they differ from other types of discounts seeks to expand the appropriate judicial role. The DLA did not, contrary to the plaintiff's argument, "entirely fail to consider an important aspect of the problem."  (ECF 30 at 21.)  "An 'important aspect of the problem' is not simply whatever plaintiffs would like the [agency] to consider." *State of N.C. Bus. Enters. Program v. United States*, 110 Fed. Cl. 354, 363 (2013).  Instead, contracting officers evaluate the requirements of each solicitation in its specific context.  Contracting officers are procuring goods and services for an agency; they are not tackling theoretical issues.

Here, the contracting officer sought the waiver because the DLA wanted to mitigate a risk—particular to this solicitation—posed by prompt payment discounts.  With that goal, the economic differences between prompt payment discounts and other types of discounts are immaterial.  Noble Supply's insistence that the contracting officer expressly acknowledge and consider the nature of the differences between prompt payment discounts and other types of discounts seeks to impose an undue burden on an agency's contracting officials not required by the express requirements of the relevant FAR provision.  The waiver acknowledges the claim that prompt payment discounts are not passed on in customary commercial practice; that acknowledgement carries with it the inference that prompt payment discounts differ in kind from other types of discounts that are customarily passed on in the commercial market.  Making that inference explicit does nothing to change the reason for the waiver request.  The waiver request

satisfies the obligation to describe the customary commercial practice imposed by FAR 12.302(c).

An agency has wide discretion in making decisions *it*, not an offeror, believes are best for the procurement. *Tyler Constr. Grp. v. United State*s, 570 F.3d 1329, 1334 (Fed. Cir. 2009). The DLA's determination that the differences between prompt payment discounts and other discounts do not merit in-depth analysis to impose solicitation terms to control risk in the Prime Vendor program does not mean that it has overlooked or failed to understand these differences. *See Yeda Rsrch. v. Mylan Pharms., Inc.*, 906 F.3d 1031, 1046 (Fed. Cir. 2018) ("[F]ailure to explicitly discuss every fleeting reference or minor argument does not alone establish that the [agency] did not consider it."). The plaintiff has not explained how the differences between prompt payment discounts and other types of discounts pertain to the risks the DLA sought to mitigate in this solicitation.

The DLA's description of customary commercial practices in satisfaction of FAR 12.302(c) is adequate considering the context of the waiver request and the purpose for which the DLA sought the waiver. The contracting officer explained that the specific circumstances of this contract require more transparency and accountability than might be required by another contract. (AR 2192.) Without the discount provision, as construed by the DLA, the Prime Vendor program remains vulnerable to the types of harms the DLA has suffered in previous, similar procurements. (AR 2193.) This asserted harm stems from a characteristic that prompt payment discounts share with the other discounts the DLA requires offerors to pass on to the government: they allow a prime vendor to pay below-market prices for items while charging the government the market price. It is the common risk, strategic differences notwithstanding, that unites the types of payment structures a prime vendor must pass on to the government.

### 3. The DLA's Need to Depart from Customary Commercial Practice

FAR 12.302(c) requires that an agency "support the need to include a term or condition that is inconsistent with that" customary commercial practice. The DLA's waiver request describes the distinctions between Prime Vendor program contracts and customary commercial contracts. The waiver request explains the need to require offerors to pass on prompt payment discounts under the Prime Vendor program by noting instances of past misconduct that the DLA argues the discount requirement will avoid. Noble Supply contends that the inadequacy of the waiver's description of customary commercial practices undermines the reasonableness of the remainder of the waiver's analysis, such that the waiver does not comply with FAR 12.302(c).

The waiver request explains that each awardee under the Prime Vendor program functions as a "finder," drawing upon its industry contacts to source the materials the MRO division requires. (AR 2190.) The prime vendor is paid for its efforts through a distribution fee, which includes the vendor's anticipated profit. The prime vendor's profit is specifically limited to the amount listed in its "proposed, fixed distribution fee." (*Id.*) The waiver request further explains that the discount requirements (including prompt payment discounts) are necessary because without them a prime vendor could "artificially increase the acquisition price of an item to the detriment of the [g]overnment and taxpayer, while receiving discounts, rebates, and/or other remittances from its supply sources to augment its profits." (AR 2191.) The waiver

explains that the discount provisions for the Prime Vendor program are necessary to ensure that the DLA avoids problems it has previously encountered in the absence of such provisions.

FAR 12.302(c) also requires a waiver to include a determination that the customary commercial practice is inconsistent with the government's needs.  The DLA explains in the waiver request that any "practices contrary to the requirements of the program as set forth in Amendment 0012 are not sufficient to meet the [g]overnment's needs for transparency, accountability, protection against potential fraudulent business practices, and elimination of unnecessary costs under this contracting program."  (*Id.*)  The parties do not dispute that this section of the waiver complies with FAR 12.302(c).  While restated only briefly in this section of the waiver request, each reason given appropriately connects the waiver request to the needs of the solicitation that were described in detail in the preceding section of the waiver.  Noble Supply has not explained why any of the DLA's purported justifications is irrational in the specific context of the Prime Vendor program.  The plaintiff may disagree with the DLA's expectation of how prompt payment discounts will likely affect the solicitation's objectives, but the plaintiff's assertion that the DLA did not make the determinations required by FAR 12.302(c) is belied by the text of the waiver request itself.  The waiver request reasonably ties its means with its ends.  Noble Supply's challenge fails.

The DLA requested and obtained a waiver that satisfies FAR 12.302(c), reasonably ties its purpose with its means, and is not arbitrary and capricious.[5]  Having received the necessary waiver, the DLA was authorized to issue Amendment 12 to include the requirement that offerors pass prompt payment discounts on to the government alongside other discounts and rebates.

### C.      The MRO Division Chief's Authority to Approve the Waiver

The plaintiff argues that the DLA violated Procurement Note C08 to the DLAD "Tailored Logistics Support Purchase Reviews" by issuing Amendment 12.[6]  (ECF 30 at 35; DLAD 161-63.)  Under Procurement Note C08, changes to procurement *policy* must be approved by the

---

[5] Even if prompt payment discounts are not properly treated as "discounts," the waiver also covers "rebates and/or other remittances."  (AR 2189.)  The plaintiff has not addressed why prompt payment discounts cannot be considered "rebates" or "remittances."  In any case, the waiver's inclusion of these three terms reflects a broader sweep than the "general" discounts on which the plaintiff contends the waiver focuses.

[6] The DLAD "implements and supplements requirements of the [FAR], the Defense FAR Supplement (DFARS), DFARS Procedures, Guidance and Information (PGI), Department of Defense publications, and DLA Issuances."  DLAD 1.301(a).  All solicitations issued by the DLA must comply with the provisions of the DLAD, but a "[Chief Contracting Officer] may approve provisions and clauses developed by a single procurement that fulfill a specific and unique requirement of the acquisition. . . .  Such provisions and clauses *shall not constitute a deviation from higher-level regulations or from the DLAD* . . ."  DLAD 1.301(a)(1)(A) (emphasis added).

14

DLA's Acquisition Director.  Amendment 12 was not approved by the DLA Acquisition Director.  Rather, in accordance with DLAD 12.302(c), the waiver was approved by the contracting officer's first-level supervisor, a level below the DLA Acquisition Director.  (AR 2193.)

Noble Supply argues that the inclusion of prompt payment discounts in the solicitation through Amendment 12 reflects a change of DLA policy that affects procurements for other DLA prime vendor programs, and therefore, the waiver underlying Amendment 12 was subject to higher-level approval.  (ECF 30 at 35.)  Despite this broad claim, Noble Supply does not cite any language in the waiver that suggests it applies broadly, nor does it cite any other solicitations or amendments claiming to include this same variance from customary commercial practices based on this waiver approved by the contracting officer's supervisor.

At oral argument, counsel for the DLA explained that the inclusion of prompt payment discounts within a discount pass-through requirement applies only to the solicitation at issue in this protest.  A waiver must be read in the context of the specific solicitation in which it is being issued, and here, the structure of the Prime Vendor program demands the passing on of prompt payment discounts when solicitations under other programs do not.  Other DLA programs, counsel explained, have controls in place that effectively eliminate the risk that prompt payment discounts impose on the DLA.  Noble Supply did not challenge this explanation, and nothing in the waiver itself suggests the waiver applies more broadly to other DLA prime vendor programs or other procurements.

Noble Supply has failed to show that the requirement being imposed in this solicitation reflects a policy change to broadly require vendors to pass prompt payment discounts on to the government.  Accordingly, the level of approval for the waiver was sufficient.

## VI.   CONCLUSION

Noble Supply has not waived its ability to protest the solicitation's requirement that offerors pass prompt payment discounts on to the government.  Noble Supply has, however, failed to show that the DLA acted arbitrarily and capriciously in including this requirement in the solicitation, and the waiver the DLA obtained under FAR 12.302(c) is not arbitrary and capricious.  Accordingly, the plaintiff's motion for judgment on the administrative record is denied, and the defendant's and the defendant-intervenor's motions for judgment on the administrative record are granted.  A separate order reflecting this decision will be entered.

s/ Richard A. Hertling
**Richard A. Hertling**
**Judge**